**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 14-1329

———————

CALLA WRIGHT; WILLIE J. BETHEL; AMY T. LEE; AMYGAYLE L.
WOMBLE; JOHN G. VANDENBERGH; BARBARA VANDENBERGH; AJAMU G.
DILLAHUNT; ELAINE E. DILLAHUNT; LUCINDA H. MACKETHAN;
WILLIAM B. CLIFFORD; ANN LONG CAMPBELL; GREG FLYNN;
BEVERLEY S. CLARK; CONCERNED CITIZENS FOR AFRICAN-AMERICAN
CHILDREN, d/b/a Coalition of Concerned Citizens for
African-American Children; RALEIGH WAKE CITIZENS
ASSOCIATION,

            Plaintiffs – Appellants,

    v.

STATE OF NORTH CAROLINA; WAKE COUNTY BOARD OF ELECTIONS,

            Defendants – Appellees.

———————

Appeal from the United States District Court for the
Eastern District of North Carolina, at Raleigh. Terrence
W. Boyle, District Judge. (5:13-cv-00607-BO)

———————

Argued: December 10, 2014        Decided: May 27, 2015

———————

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

———————

Affirmed in part, reversed in part, and remanded by
published opinion. Judge Wynn wrote the majority opinion,
in which Judge Gregory joined. Judge Motz wrote a
dissenting opinion.

———————

**ARGUED:** Anita Sue Earls, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Appellants. Alexander McClure Peters, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Scott Wood Warren, WAKE COUNTY ATTORNEY'S OFFICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Roger A. Askew, Claire A. Hunter, WAKE COUNTY ATTORNEY'S OFFICE, Raleigh, North Carolina, for Appellee Wake County Board of Elections.

———————————

WYNN, Circuit Judge:

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104-05 (2000) (citation omitted).

Thirteen citizens of Wake County, North Carolina challenge a state law redrawing the Wake County Board of Education electoral districts. Plaintiffs contend that under the new redistricting plan, some citizen's votes will get significantly more weight than other's in violation of the Fourteenth Amendment's guarantees of one person, one vote and the North Carolina Constitution's promise of equal protection. For the reasons explained below, we conclude that Plaintiffs have stated a claim upon which relief could be granted against the Wake County Board of Elections and that the district court therefore erred in dismissing their suit. However, we affirm the denial of the motion to amend because the state officials Plaintiffs proposed to add as named defendants are not amenable to suit.

I.

Accepting the facts in Plaintiffs' complaint as true, as we must on a motion to dismiss, Plaintiffs allege that until 2013, the Wake County Board of Education ("Board of Education") was composed of members elected from nine single-member districts. The Board of Education's functioning and selection was governed by North Carolina General Assembly Session Law 1975-717, which required, among other things, that the Board of Education redistrict itself every ten years following the decennial census.

In 2010, the census showed that Wake County's population had grown by 43.51% over the preceding decade, with a maximum population deviation among the then-existing school board districts of 47.89%.[1]  The Board of Education thus redrew its districts in 2011, resulting in geographically compact districts with a maximum population deviation of 1.66% and no district

---

[1] "To determine compliance with the one person, one vote principle courts usually analyze the apportionment plan in terms of the maximum population deviation among the districts. Generally, to calculate maximum deviation, the court first constructs a hypothetical ideal district by dividing the total population of the political unit (e.g., state or county) by the total number of representatives who serve that population. Then, the court determines how much the actual population of each district varies from the population of the ideal district. This deviation is expressed as a percentage of the ideal population.  Maximum deviation is the sum of the absolute value of the deviation of the district with the smallest population and that of the district with the largest population."  Daly v. Hunt, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996).

deviating from the ideal district population by even 1%. See Appendix 1 (from Plaintiffs' complaint at J.A. 19).

The plan was put into place by a Board of Education that was majority Republican. But under the new plan, the fall 2011 elections resulted in a Board of Education with a Democratic majority. Plaintiffs allege that because the new plan resulted in a Democratic majority, the Republican-controlled North Carolina General Assembly, in turn, "over the objection of a majority of the Wake County School Board, passed a local bill making numerous changes in the method of selection." J.A. 11. "No Democratic member of the legislature voted for it, and no African-American member of the legislature voted for it." J.A. 21.

The bill, Session Law 2013-110 ("Session Law"), made "numerous" changes to the Wake County Board of Education's methods of election. Central to Plaintiffs' complaint, the Session Law changed the Board of Education's make-up from nine single-member districts to seven single-member districts and set less geographically compact boundaries for this new set of districts. See Appendix 2 (from Plaintiffs' complaint at J.A. 23). The maximum population deviation among the single-member districts is 7.82%.

Further, the Session Law created two "super districts." One super district forms a donut of "outer, rural areas of the

5

county," while the other forms a donut hole in the "inner, urban" area. J.A. 11. See Appendix 3 (from Plaintiffs' complaint at J.A. 25). The maximum population deviation between the superdistricts is 9.8%.

The Session Law also prohibits the Board of Education from "making any further changes in its method of election until 2021," something it previously could do. J.A. 11. Wake County is thus burdened with some "substantially over-populated" districts, where votes will be diluted vis-à-vis other "substantially under-populated" districts. J.A. 26. Those districts are "visually and mathematically less compact" and "split 21 unique precincts in the county" (as opposed to the prior districts, which split only 11 precincts). J.A. 28.

Plaintiffs sued the State of North Carolina and the Wake County Board of Elections ("Board of Elections"), the entity charged with administering the Board of Education's elections. Plaintiffs complained that the Session Law "overpopulates, without justification, certain districts, causing the vote of Plaintiffs living in those overpopulated districts to be weighted less than votes of citizens in districts that are unjustifiably under-populated." J.A. 11. Plaintiffs thus claimed that the Session Law violates the United States Constitution's one person, one vote guarantees and the North Carolina Constitution's equal protection clause.

Defendants answered and moved to dismiss. Plaintiffs, in turn, sought leave to amend their complaint, substituting Governor Patrick McCrory, Senate President Pro Tem Phillip Berger, and General Assembly Speaker Thom Tillis ("individual state officials") in their official capacities for the State of North Carolina.

The district court granted Defendants' motions to dismiss and denied Plaintiffs' motion to amend as futile. Specifically, the district court held that it had no jurisdiction over the State, that Eleventh Amendment immunity also insulated the individual state officials from suit, and that Plaintiffs' one person, one vote claims were really "partisan gerrymandering" claims, which it considered non-justiciable under both the United States and North Carolina Constitutions. Plaintiffs timely appealed.

## II.

We first consider Plaintiffs' argument that the district court erred in ruling that Proposed Defendants Tillis and Berger ("Proposed Defendants") were not proper parties to their suit.[2]

---

[2] Plaintiffs have not challenged the district court's dismissal of the State from their suit. Further, Plaintiffs conceded in their reply brief that Defendant McCrory lacked a "sufficient connection to the enforcement of the redistricting plan at issue here" to constitute a proper defendant. Reply Br. (Continued)

And we do so de novo.  Franks v. Ross, 313 F.3d 184, 192-93 (4th Cir. 2002) (noting that "the existence of sovereign immunity is a question of law that we review de novo" and that "we review de novo a . . . legal determination [of] whether Ex parte Young relief is available") (quotation marks and citations omitted).

Under the Eleventh Amendment, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The United States Supreme Court has read the Eleventh Amendment to render States immune from being hauled into federal court by private parties.  Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 760 (2002).

While the Eleventh Amendment provides significant protections to States, the immunity it provides to state officials is less robust.  Specifically, a state official "ceases to represent the state when it attempts to use state power in violation of the Constitution."  Sch. Bd. of City of Charlottesville, Va. v. Allen, 240 F.2d 59, 63 (4th Cir. 1956).  See also Ex parte Young, 209 U.S. 123 (1908).  Such officials

---

at 22.  We therefore do not address the propriety of these parties as defendants.

8

thus "may be enjoined from such unconstitutional action"—sued and stopped, in other words—but only if they have "some connection with the enforcement" of an unconstitutional act. Id. at 157; see also Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 685 (1982).

To be amenable to suit under the Eleventh Amendment, there must exist a "special relation" between the state official being sued and the challenged action. Ex parte Young, 209 U.S. at 157. See also, e.g., Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001) ("Ex parte Young requires a 'special relation' between the state officer sued and the challenged statute to avoid the Eleventh Amendment's bar."). This requires "proximity to and responsibility for the challenged state action." S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis in original). By contrast, "[g]eneral authority to enforce the laws of the state is an insufficient ground for abrogating Eleventh Amendment immunity." Id. (quotation marks omitted).

For example, in McBurney v. Cuccinelli we held that Virginia's attorney general did not have a specific duty to enforce the state's freedom of information act and thus was not subject to suit under Ex parte Young. 616 F.3d 393, 400-02 (4th Cir. 2010). We noted that Virginia had vested such authority in local prosecutors as opposed to the attorney general. Further,

9

we likened the attorney general's duty to issue advisory opinions to the governor's duty to uphold state law—not sufficient to impose the required "special relation" to enforce the law so as to make him a proper defendant. Id. at 401.

By contrast, in S.C. Wildlife Federation, we held that the sued state official—there the director of South Carolina's Department of Transportation—had a sufficiently close relationship with the challenged law or action to be amendable to suit. 549 F.3d at 332-34. In that case, the plaintiffs alleged violations of the National Environmental Policy Act arising from the proposed construction of a bridge in South Carolina. We held that both state and federal law imposed specific duties upon the director that gave rise to the required special relation. Id. at 333-34.

Turning to the case at hand, we agree with the district court that neither Proposed Defendant had a special duty to enforce the challenged Session Law, and thus neither is amenable to suit. The North Carolina Constitution clearly assigns the enforcement of laws to the executive branch. N.C. Const. art. III, § 5. The General Assembly retains no ability to enforce any of the laws it passes. Cf. id. And Proposed Defendants are merely members of North Carolina's General Assembly. Additionally, as is the case with all election plans in North Carolina, the county Board of Elections, in cooperation with the

10

State Board of Elections, has the specific duty to enforce the challenged redistricting plan. N.C. Gen. Stat. §§ 163-22, 163-33.

Plaintiffs counter that if the Proposed Defendants are not party to their suit, there will be no mechanism for forcing a constitutionally valid election, should they succeed in enjoining the Session Law.[3] This assertion is, however, incorrect. The district court could, for example, mandate that the Board of Elections conduct the next election according to the scheme in place prior to the Session Law's enactment until a new and valid redistricting plan is implemented. State law also provides, for example, that the State Board of Elections can make reasonable interim rules with respect to pending elections. N.C. Gen. Stat. § 163-22.2 ("In the event . . . any State election law . . . is held unconstitutional or invalid by a State or federal court or is unenforceable . . ., the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election."). Without question, then, a valid election could take place if Plaintiffs succeed on the merits and successfully enjoin the Session Law.

_____

[3] Plaintiffs make various other arguments relating to, for example, the availability of attorneys' fees, which we summarily reject.

11

In sum, neither Proposed Defendant has any enforcement authority over election proceedings, and, accordingly, neither falls within the Eleventh Amendment exception to immunity established in Ex parte Young. We thus affirm the district court's determination that adding Speaker Tillis and President Pro Tem Berger as defendants would be futile.

## III.

With their main argument on appeal, Plaintiffs contend that the district court erred when it dismissed their complaint for failure to state a claim upon which relief could be granted. We review the district court's dismissal of the Plaintiffs' complaint de novo, "accept[ing] as true all of the factual allegations contained in the complaint" and drawing "all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quotation marks and citations omitted). Further, while the complaint "must contain sufficient facts to state a claim that is plausible on its face," it nevertheless "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." Id. (quotation marks and citations omitted).

To the extent Plaintiffs' claims do "not fall within the four corners of our prior case law," this "does not justify

12

dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" McGary v. City of Portland, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting Baker v. Cuomo, 58 F.3d 814, 818-19 (2d Cir. 1995), vacated in part on other grounds, 85 F.3d 919 (2d Cir. 1996) (en banc)). See also 5B Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 1357 (3d ed. 2015) (noting that courts should "be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability" is "novel" and thus should be "explored"). Indeed, as the law "firm[s] up" in unsettled areas, "it may be more feasible to dismiss weaker cases on the pleadings;" otherwise, plaintiffs should be given "an opportunity to develop evidence before the merits are resolved." Metts v. Murphy, 363 F.3d 8, 11 (1st Cir. 2004).

Finally, we bear in mind that "'a complaint is to be construed liberally so as to do substantial justice.'" Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 311 (4th Cir. 2009) (quoting 5 Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1202 (3d ed. 2004)). See also, e.g., Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians, 155 F.3d 500, 505

13

(4th Cir. 1998) (noting that "pleading standards require that the complaint be read liberally in favor of the plaintiff").

A.

The Fourteenth Amendment's equal protection clause guarantees not only "the initial allocation of the franchise"— that is, the right to vote. Bush, 531 U.S. at 104. Rather, equal protection "applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id. at 104-05.

Inherent in the equal protection of voting is the requirement that all citizens' votes be weighted equally, a principle that is commonly known as one person, one vote. Reynolds v. Sims, 377 U.S. 533, 563, 565 (1964). "This principle ensures that every voter, no matter what district he or she lives in, will have an equal say in electing a representative." Daly, 93 F.3d at 1216. "A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause." Reynolds, 377 U.S. at 568.

The one person, one vote principle applies not just to the federal government but also to state and local government. Avery v. Midland Cnty., 390 U.S. 474, 480 (1968). Of particular

14

note in this case, the Supreme Court has left no doubt that one person, one vote applies to school boards. Id. ("If voters residing in oversize districts are denied their constitutional right to participate in the election of state legislators, precisely the same kind of deprivation occurs when the members of a city council, school board, or county governing board are elected from districts of substantially unequal population." (emphasis added)).

The courts have recognized that "[m]athematical exactness or precision is hardly a workable constitutional requirement" and do not hold state or local government districts to such a standard. Daly, 93 F.3d at 1217 (quoting Reynolds, 377 U.S. at 577). Nevertheless, governments must "make an honest and good faith effort" to construct districts as close to equal population "as is practicable." Daly, 93 F.3d at 1217 (quoting Reynolds, 377 U.S. at 577).

Generally, therefore, a district apportionment plan with a maximum population deviation under 10% will not, "by itself," support an equal protection claim. Daly, 93 F.3d at 1217-18. The 10% threshold does not, however, "insulate" a state or local districting plan from attack. Id. at 1220. Rather, it determines the "allocat[ion of] the burden of proof," with a plaintiff in a case below the 10% population disparity mark unable to "rely on it alone to prove invidious discrimination or

15

arbitrariness.  To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.'"  Id. (quoting Roman v. Sincock, 377 U.S. 695, 710 (1964)).[4]

Here, Plaintiffs allege such a "taint of arbitrariness or discrimination."  Id.  Specifically, Plaintiffs complain that the challenged districts discriminate between urban and rural voters, "overpopulat[ing], without justification, certain districts, causing the vote of Plaintiffs living in those overpopulated districts to be weighted less than votes of

_____

[4] The Supreme Court has admonished courts not to confuse evidentiary standards that govern plaintiffs' burden at summary judgment with the liberal pleading requirements established by Rule 8(a) of the Federal Rules of Civil Procedure.  In Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002), the Supreme Court reversed the Second Circuit's requirement that the plaintiff plead a prima facie case of Title VII discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The Court stated that "[t]he prima facie case under McDonnell Douglas . . . is an evidentiary standard, not a pleading requirement."  Id. at 510.  See also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (stating that the district court erred in requiring the plaintiff "to plead facts establishing a prima facie case of discrimination to survive a motion to dismiss").
Our task is to determine whether Plaintiffs have pled a plausible violation of the state and federal constitutions. E.I. du Pont de Nemours, 637 F.3d at 440 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  That task does not hinge on the determination of whether Plaintiffs have pled a maximum population deviation exceeding 10%, which is merely one way in which Plaintiffs can prove their prima facie case at the evidentiary stage.

16

citizens in districts that are unjustifiably under-populated." J.A. 11. See Reynolds, 377 U.S. at 568 (stating that "a qualified voter[] is no more nor no less so because he lives in the city or on the farm"). The district court itself recognized that "Plaintiffs allege a favoritism of rural areas of the county over urban areas[,]" J.A. 88, and even Defendants agree that Plaintiffs "do allege that the plan pits urban voters against rural voters." Appellees' Br. at 20. It is hard to square all of this with the dissenting opinion's assertion that "Plaintiffs do no such thing." Post at 7. In any event, Defendants' concession highlights that Plaintiffs here fulfilled Rule 8's core requirement: they "'g[a]ve the defendant fair notice of'" their claims. Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Twombly, 550 U.S. at 555).

Further, Plaintiffs complain that the districts, particularly when compared to the previous districts that had been drawn up just two years prior, were "visually and mathematically less compact," "confusing," and had significantly higher population deviations. J.A. 15, 28. Plaintiffs also alleged that the challenged redistricting "split 21 unique precincts," whereas the prior plan divided only 11. J.A. 28. Plaintiffs point out that not only did the Board of Education itself oppose the redistricting, but that "[n]o Democratic member," and "no African-American member" of North Carolina's

17

General Assembly supported the redistricting, suggesting, for Rule 12(b)(6) review, that it was neither racially nor otherwise neutral. J.A. 21.

Finally, Plaintiffs contend that the challenged redistricting is intended "to disfavor incumbents who are registered Democrats and support progressive education policies." J.A. 28. According to Plaintiffs, the redistricting "further[s] Republican interests and advance[s] conservative agenda policies—over the wishes of the Wake County electorate"— which they contend is "not a legitimate state interest that justifies the population deviations." Id. Again, even the district court recognized that Plaintiffs allege "the targeting of democratic incumbents" and "impermissible political bias." J.A. 88.

When Plaintiffs' complaint is viewed through the forgiving lens mandated at the motion-to-dismiss stage, it states a plausible claim for which relief can be granted. Plaintiffs allege in detail a redistricting that resulted in a maximum population deviation of nearly 10%. Plaintiffs describe how and why that deviation was unjustified, discriminatory, and unconstitutional. They do not allege that the apportionment plan with a maximum population deviation just barely under 10% "by itself" supports their equal protection claim, but rather they plead facts indicating that the apportionment "had a taint

18

of arbitrariness or discrimination." Daly, 93 F.3d at 1217, 1220 (quotation marks and citation omitted).

The dissenting opinion is quick to reject the complaint for its failure to engage in talismanic incantations of magic words like "arbitrary." Post at 2 (making much ado of the fact that the "complaint does not even contain the words 'bad faith' [or] 'arbitrariness'"). That Plaintiffs chose to plead facts sounding in arbitrariness rather than simply invoking the word demonstrates to us only that Plaintiffs have heeded the Supreme Court's warning that "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. It is clear to us that Plaintiffs pled arbitrariness when they alleged, for example, that the redistricting was done "without justification," J.A. 11, and that the deviations "do not further any legitimate redistricting criteria," J.A. 28.

Similarly, the district court rejected Plaintiffs' allegations and dismissed their complaint. In doing so, it cited not a single case on all fours with this one nor any case mandating such an outcome. Defendants similarly have identified no precedent that suggests that dismissing Plaintiffs' complaint at this stage is warranted, much less required.

To the contrary, a closer look at the precedent Defendants and the district court cite underscores that Plaintiffs' claims should survive. For example, both Defendants and the district

19

court rely on Daly, 93 F.3d 1212, to justify dismissal here. Tellingly, however, we held in Daly that a plaintiff in a case falling below the 10% population disparity mark may not "rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.'" Id. at 1220 (quoting Roman, 377 U.S. at 710) (emphasis added).[5] Thus, in Daly, rather than dismiss the plaintiffs' claims, we remanded the matter, stating that "[w]hether Plaintiffs can produce any credible evidence to establish that the apportionment plan at issue here was the product of bad faith, arbitrariness, or invidious discrimination should be addressed on remand." Id. at 1222.

Similarly, Roman, 377 U.S. 695, on which we relied in Daly, was decided after a trial. And Gaffney v. Cummings, on which the district court relied and in which the Supreme Court held that an otherwise acceptable reapportionment plan was not made constitutionally vulnerable by the fact that its purpose was to

---

[5] Defendants use similar verbiage in their appellate brief, arguing that "because plaintiffs have failed to show arbitrariness or discrimination, these claims should be dismissed." Appellees' Br. at 8. But Plaintiffs need not "show" anything at this point; rather, they need only allege facts that make arbitrariness or discrimination plausible in addition to population disparities under 10%.

achieve political fairness between the major political parties, was decided after "[c]onsiderable evidence was introduced." 412 U.S. 735, 739 (1973).[6]

By contrast, both Defendants and the district court try to distinguish and dispense with Cox v. Larios, a case notably more similar to the one at hand and illustrative of the district court's error in dismissing Plaintiffs' complaint. 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three judge panel), summarily aff'd, 542 U.S. 947 (2004). In Larios, a federal court struck down a statewide legislative redistricting plan in Georgia. The plaintiffs there alleged that the plan disproportionately favored Democrats in the state by under-populating districts in the urban Atlanta region and the rural south-Georgia area—both Democratic strongholds—while overpopulating districts with Republican-leaning voters. The redistricting plan thereby created a maximum population deviation of 9.98%. Id. at 1327. Additionally, the new plan disproportionately protected

---

[6] The district court cited Gaffney to support its assertion that "differences in population disparities between the old 2011 plan and the new Session Law [] plan are of no consequence" because the "Supreme Court has expressly rejected the argument that the possibility of drafting a 'better' plan alone is sufficient to establish a violation of the one person, one vote requirement." J.A. 87. Of course, the complaint here, on its face, belies any suggestion that Plaintiffs allege the possibility of a better plan "alone." What is more, that would not logically make the differences in disparities "of no consequence."

Democratic incumbents. Id. at 1329-30. The district court in Larios found that the state purposefully drew districts in a way to exist within "what they perceived to be a 10% safe harbor" and struck the plan as unconstitutional. Id. at 1328. The Supreme Court summarily affirmed the Larios decision.

We recognize that "the precedential effect of a summary affirmance can extend no further than 'the precise issues presented and necessarily decided by those actions.'" Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182 (1979) (quoting Mandel v. Bradley, 432 U.S. 173, 176 (1977)). Such summary actions "should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." Mandel, 432 U.S. at 176.

While sensitive to its limitations, we can nevertheless glean several lessons from the Larios summary affirmance. First, the Supreme Court has not created a 10% maximum population deviation threshold, below which all redistricting decisions are inherently constitutional. This point was made clear by Justice Stevens's opinion concurring in the affirmance and highlighting the court's rejection of a safe harbor for districting plans that rest within the 10% threshold:

> [A]ppellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than 10 percent, within which

22

districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation. After our recent decision in Vieth v. Jubelirer, 541 U.S. 267, 124 S. Ct. 1769, 158 L.Ed.2d 546 (2004), the equal-population principle remains the only clear limitation on improper districting practices, and we must be careful not to dilute its strength.

542 U.S. at 949-50 (emphasis added). Second, the Supreme Court necessarily believed to be correct the district court's rejection of discriminatory treatment of incumbents from one party over those of another, the district court's rejection of allowing citizens in certain areas to have disproportionate electoral influence, or both, since the lower court's ruling relied on those bases in striking the redistricting as unconstitutional. Larios, 300 F. Supp. 2d at 1338.

Here, Plaintiffs allege that, as in Larios, a state legislature designed a redistricting plan with a maximum deviation in population of just under 10%, designed to pit rural and urban voters against one another, and intended to favor incumbents of one political party over those of another. Even if Larios does not control this case (though neither Defendants nor the district court point to anything else squarely on point and controlling, either), we nevertheless find it persuasive.

The district court's rejection of Larios rested on an altogether arbitrary distinction. The district court declared that "Larios dealt with state-wide elections whereas this case

23

deals only with Wake County. The broad geographic differences found within a state are not found within one county." J.A. 89. The lack of a factual basis for this statement aside, the district court failed to identify how such a difference in scale might justify rejecting Plaintiffs' claims as a matter of law. Indeed, the Supreme Court recently reaffirmed that courts should analyze redistricting plans "district-by-district," reasoning that the nature of the harms is "personal" and "directly threaten[s] a voter who lives in the *district* attacked" but not "a voter who lives elsewhere." Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1265 (2015); see also Dickson v. Rucho, No. 14-839, 2015 WL 223554, at *1 (U.S. Apr. 20, 2015) (vacating judgment and remanding North Carolina's legislative redistricting in light of Alabama Legislative Black Caucus v. Alabama). We see no reason why such a "district-by-district" analysis applies any differently at the county level, and Defendants point to none.

Similarly, the district court found it "plainly apparent in Larios that [R]epublican incumbents were being targeted, whereas here the targets are less clear." J.A. 89. But certainty is not required to survive a motion to dismiss. Notably, the district court did not find it implausible that such targeting occurred here. Twombly, 550 U.S. at 570. While "the factual allegations in a complaint must make entitlement to relief

24

plausible," Rule 12(b)(6) does not countenance "dismissals based on a judge's disbelief of a complaint's factual allegations." McLean v. United States, 566 F.3d 391, 399 (4th Cir. 2009).

B.

The district court also sought to justify dismissal here by viewing Plaintiffs' complaint as "stat[ing] a political gerrymandering claim" that Plaintiffs had merely dressed "in the language of a one person, one vote claim." J.A. 88. According to the district court, political gerrymandering claims are "nonjusticiable" per Vieth v. Jubelirer, 541 U.S. 267 (2004). J.A. 88. We disagree.

In stark contrast to a mere "political gerrymandering claim," Plaintiffs allege that the Session Law violates the one person, one vote principle by creating "non-compact," "confusing" districts with maximum population deviations reaching almost 10% and that the deviation from one person, one vote is "unjustifi[ed]" and results in discrimination amongst not only political interests but also "rural" versus "urban" populations. J.A. 11, 15. In other words, Plaintiffs here have pled an equal protection claim.

Further, even if Plaintiffs had pled only a political gerrymandering claim—which they did not—we could not agree with the district court that such a claim is necessarily a non-justiciable political question mandating dismissal. Indeed, the

25

district court's assertion that "the Supreme Court found political gerrymandering claims to be nonjusticiable in Vieth v. Jubelirer, 541 U.S. 267, 281 (2004)," J.A. 88, fails to appreciate that Vieth was a plurality opinion only, onto which just four justices signed. As the plurality opinion itself recognized, Justice Kennedy, in his concurring opinion, "conclude[d] that courts should continue to adjudicate such [political gerrymandering] claims." Id. at 301. See also, id. at 306 (Kennedy, J., concurring) ("While agreeing with the plurality that the complaint the appellants filed in the District Court must be dismissed, and while understanding that great caution is necessary when approaching this subject, I would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases.") (emphasis added). The face of the plurality opinion also makes plain that the four dissenting justices, too, viewed political gerrymandering claims as being justiciable. Id. at 292-301. In other words, a majority of the Supreme Court refused to deem political gerrymandering claims to be per se nonjusticiable. And the Court has since recognized as much. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 414 (2006) ("A plurality of the Court in Vieth would have held

26

[political gerrymandering] challenges to be nonjusticiable political questions, but a majority declined to do so.").

At the end of the day, we cannot say whether Plaintiffs will ultimately succeed with their equal protection claim. But we can say that they have made allegations sufficient to withstand a motion to dismiss for failure to state such a claim. The district court erred in holding otherwise.

C.

Separately but relatedly, Plaintiffs claim that they have been denied equal protection under the North Carolina Constitution, which also "guarantees the principle of one-person, one-vote and demands that the vote of each citizen be valued equally." J.A. 30. As the district court noted, "Plaintiffs allege the same supporting facts for their North Carolina Constitutional claim as for their United States Constitutional claim." J.A. 90.

North Carolina's courts have unequivocally stated that under the North Carolina Constitution, "[t]he right to vote on equal terms in representative elections—a one-person, one-vote standard—is a fundamental right." Blankenship v. Bartlett, 681 S.E.2d 759, 762-63 (N.C. 2009) (citing Northampton Cnty. Drainage Dist. No. One v. Bailey, 392 S.E.2d 352, 356 (N.C. 1990)). Further, the Supreme Court of North Carolina's analysis regarding "the State Constitution's Equal Protection Clause

27

generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." Blankenship, 681 S.E.2d at 762. In fact, North Carolina courts have even found the one person, one vote principle to apply in instances where the federal courts have not. See id. at 763 (finding the one person, one vote principle applicable in North Carolina's election of superior court judges even though "federal courts have articulated that the 'one-person, one-vote' standard is inapplicable to state judicial elections").

As with the federal constitutional claim, the district court shoe-horned Plaintiffs' state-law one person, one vote contentions into a political gerrymandering claim it then deemed nonjusticiable. The district court stated that "plaintiffs' factual allegations amount to a claim of impermissible political bias which is a claim of political gerrymandering." J.A. 91. While the district court candidly admitted that it had "found no North Carolina case law which supports a finding that such a claim is nonjusticiable," it nevertheless dismissed this claim, too, citing Vieth. Id. Its failure to find state law support for dismissal at the Rule 12(b)(6) stage should have given the district court pause. In any event, for the reasons that we hold Plaintiffs' claims under the Equal Protection Clause of the Federal Constitution should not have been dismissed, we likewise

28

hold that Plaintiffs' North Carolina constitutional claim should not have been dismissed.

IV.

Plaintiffs' allegations in support of their claim that the Session Law violates the one person, one vote principle suffice to survive a motion to dismiss for failure to state a claim. The district court thus erred in dismissing Plaintiffs' complaint. The district court did not err, however, in determining that the Proposed Defendants are not amenable to suit.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

No matter how liberally construed, and notwithstanding the majority's vigorous attempts at resuscitation, the complaint in this case fails to state a claim upon which relief can be granted. The district court properly dismissed it.

## I.

Plaintiffs allege that a redistricting plan, which establishes districts for a non-partisan county school board election with a maximum population deviation of under 10%, violates the Constitution. Over 30 years ago, the Supreme Court expressly held that "a maximum population deviation under 10% falls within th[e] category of minor deviations" that render a redistricting plan presumptively constitutional. Brown v. Thomson, 462 U.S. 835, 842 (1983). The Court has never retreated from this presumption and the circuit courts have faithfully applied it. See, e.g., Daly v. Hunt, 93 F.3d 1212, 1219-20 (4th Cir. 1996); see also League of Women Voters of Chicago v. City of Chicago, 757 F.3d 722, 725 (7th Cir. 2014); Chen v. City of Houston, 206 F.3d 502, 523 n.15 (5th Cir. 2000).

To rebut the presumption, a plaintiff must "produce . . . evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.'" Daly, 93 F.3d at 1220 (quoting Roman v. Sincock, 377 U.S. 695, 710 (1964)). To escape

30

summary judgment, this standard requires that challengers offer evidence that the plan "was the product of bad faith, arbitrariness, or invidious discrimination." Daly, 93 F.3d at 1222. To withstand a motion to dismiss, challengers need not "forecast evidence sufficient to prove the elements of [a] claim," but their complaint must "allege sufficient facts to establish those elements." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (internal quotation marks and citation omitted). Plaintiffs have utterly failed to do this.

The complaint does not even contain the words "bad faith," "arbitrariness," or "invidious discrimination," let alone allege facts supporting such claims. What Plaintiffs do allege is that the North Carolina legislature created a redistricting plan for the Wake County School Board designed to "disfavor incumbents who are registered Democrats and support progressive education policies," and to instead "further Republican interests and advance conservative agenda policies."

Plaintiffs concede, however, that Wake County's school board elections are non-partisan. Candidates in non-partisan elections run only under their own names, without "involving, representing, or supporting the ideas of any political party or group." Black's Law Dictionary (10th ed. 2014) (defining "nonpartisan"). Thus, Plaintiffs' challenge boils down to a claim that the plan governing this non-partisan election

31

disfavors incumbents who prefer certain "education policies" and advances those who prefer different "policies." A presumptively constitutional redistricting plan certainly cannot be found unconstitutional simply because it affords a de minimis apportionment advantage to those who prefer certain "policies" over other "policies."

In holding to the contrary, the majority plunges federal judges into precisely the sort of dispute that the Supreme Court has told us to avoid. Because "the apportionment task" concerns "fundamental choices about the nature of representation," that task is to be left to the states' legislative branches absent a compelling reason to usurp it. Gaffney v. Cummings, 412 U.S. 735, 749 (1973) (internal quotation marks and citation omitted). And when population deviations are less than 10%, compelling reasons are few and far between. Thus, the Supreme Court has long instructed federal courts not to wade into "the political thicket" simply to correct "minor deviations . . . that no one, with confidence, can say will deprive any person of fair and effective representation." Id. at 749-50.

By asking us to referee a dispute as to "policy," the complaint urges us to enter just this sort of "political thicket." In Plaintiffs' view (which the majority apparently shares), they can avoid dismissal of their complaint simply by alleging that the redistricting alters the political balance

32

among those favoring different "policies." If this were so, then this and every other redistricting challenge of this sort would recast federal judges as pollsters. It would make federal judges employ granular scrutiny of voting patterns even in non-partisan elections to determine if those preferring certain "policies" have been disadvantaged by redistricting. And it would require federal judges to probe the state legislature's motivation in adopting the plan. Until today, no court had suggested that a presumptively constitutional redistricting plan requires this level of supervision by a federal court.

Moreover, the fate of the school board incumbents, about whom Plaintiffs evince great concern, is irrelevant when assessing a one person, one vote claim. As the Seventh Circuit recently explained, the one person, one vote principle "protect[s] an individual's right to vote." League of Women Voters, 757 F.3d at 726 (emphasis in original) (internal quotation marks and citation omitted). It does not "insulate individual politicians from the threat of political reprisal once redistricting occurs." Id. "Simply alleging" that redistricting hands "the short end of the proverbial stick" to certain incumbents "is not enough to overcome a presumptively constitutional map." Id.

Plaintiffs apparently prefer another redistricting plan, a plan which creates districts with less population deviation,

33

districts that are more "compact," less "confusing," and split fewer "unique voting precincts." That plan may be "more constitutionally perfect." Daly, 93 F.3d at 1221. But "the possibility of drafting a 'better' plan" does not provide the basis for finding the plan created by the duly elected state legislature unconstitutional. Id.

## II.

The majority attempts to rectify the complaint's fatal shortcomings in two ways: by lowering the federal pleading standard to remove hurdles the complaint cannot clear, and by rewriting the complaint to contain facts never alleged.

## A.

The majority offers a lengthy discourse on a court's obligations when reviewing the dismissal of a complaint. But it fails to grapple with requirements the law imposes on parties seeking to state a federal claim.

Of course, a court must construe complaints liberally. But it must also ensure that, in them, plaintiffs "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must permit "the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, to escape dismissal, a complaint must allege

34

facts sufficient to "nudge[]" a plaintiff's claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. "[T]ender[ing only] 'naked assertions[s]' devoid of 'further factual enhancement'" does not suffice. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (second alteration added). The majority ignores these requirements. Instead, it relies on a view that a complaint need only provide "fair notice" of the claim alleged (notwithstanding the meritlessness of the claim) to escape dismissal, and may survive on even less if it espouses a "novel legal theory." The majority's treatment of the pleading standard mandated by the federal rules simply does not reflect the law.

Chief among a court's obligations during 12(b)(6) review is its mandate to dismiss any complaint that fails to meet the pleading standard articulated by the Supreme Court. Judged against this standard, the complaint here unquestionably fails. Far from permitting a "reasonable inference" of liability, it hangs its hopes on an unprecedented expansion of the one person, one vote doctrine in conflict with the Supreme Court's teachings. The district court correctly dismissed it.

B.

Even were the pleading bar as low as the majority insists, the complaint would not clear it. In an attempt to remedy this deficiency, the majority invents allegations never pled.

35

First, the majority asserts that "Plaintiffs complain that the challenged districts discriminate between urban and rural voters." But Plaintiffs do no such thing. Their sole reference to a divide between urban and rural voters comes in the complaint's first paragraph, which characterizes the plan as creating "two 'super-districts' . . . with an inner, urban super-district and an outer, rural super-district." Neither the word "urban" nor the word "rural" appears again in the complaint. Nowhere do Plaintiffs allege a claim of discrimination based on geography, let alone facts sufficient to make such a claim plausible.

Next the majority insists that "Plaintiffs allege" the redistricting plan was "intended to favor incumbents <u>of one political party</u> over those of <u>another</u>." But again, this is simply not the case.[*] Rather, as plaintiffs concede, the challenged redistricting plan governs a <u>non-partisan</u> school

---

[*] Of course if the complaint did, as the majority asserts, challenge the plan as favoring one political party over another, then the Supreme Court's judgment in <u>Vieth v. Jubelirer</u>, 541 U.S. 267 (2004), would, as the district court concluded, seem critical. There, a plurality of the Court agreed that political-party gerrymandering claims are nonjusticiable, <u>id.</u> at 281, and a fifth Justice agreed that such claims should not merit relief until "workable standards . . . emerge" to govern them, <u>id.</u> at 317 (Kennedy, J., concurring). The concerns animating a majority of the Court in <u>Vieth</u> are not assuaged simply by rerouting the path into the political thicket through an apportionment claim, rather than a gerrymandering claim.

36

board election in which no candidate is affiliated with <u>any</u> party.

The motive for adding these two allegations to the complaint seems clear. They are critical to the majority's attempt to align this case with <u>Larios v. Cox</u>, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge panel), <u>summarily aff'd</u>, 542 U.S. 947 (2004), on which it so heavily relies. There, the district court held unconstitutional a Georgia redistricting plan because it was the product of "a deliberate and systematic policy of favoring rural and inner-city" areas over "suburban areas," and nominees of the Democratic party over those of the Republican party. <u>Id.</u> at 1327, 1329. Even if <u>Larios</u> constituted binding precedent, which it does not, it provides no help to Plaintiffs here. For, stripped of the majority's additions, the complaint here contains <u>no</u> allegations of either regional or political-party favoritism.

The majority's response to this conclusion is telling. The majority does not, because it cannot, cite or quote any portion of the complaint giving lie to this conclusion. Instead, the majority relies on statements about the complaint made by the district court and the Defendants. But such statements provide no substitute for allegations missing from the complaint itself. Indeed, the majority's need to rely on outside sources in its attempt to establish the complaint's allegations demonstrates

37

still again how deficient the complaint is.  Just as outsiders could not supply the Emperor with new clothes, they cannot supply the complaint with new allegations.

## III.

In sum, the allegations in the complaint, taken in the best light for Plaintiffs, do not set forth facts that plausibly rebut the presumption of constitutionality afforded this plan. Contrary to the majority's contention, dismissal of the complaint here is not for want of "an opportunity to develop evidence before the merits are resolved."  It is for want of allegation of facts that would permit a court to believe Plaintiffs could establish a viable claim.  See Walters, 684 F.3d at 439.

The right to vote is precious.  But its invocation does not empower federal courts to commandeer state legislative functions or eliminate federal pleading requirements.  The Supreme Court has long held that the Constitution, while affording enormous protection to the right to vote, tolerates minor apportionment deviations.  The majority today replaces this considered judgment with its own, preferring a "vast, intractable apportionment slough," Gaffney, 412 U.S. at 750, to the well-worn path the Supreme Court has forged and mandated we follow.

With respect, I dissent.

38

# Wake County School Board
## Current Districts





Wake County School Board
S325 Numbered Districts



Wake County School Board
S325 Lettered Districts