TRAXLER, Chief Judge,
dissenting:
In March 2010, Dan Pierce terminated Karen Greene’s fourteen-year stint as the janitor at Harris Corporation because Greene is a lesbian and, in Pierce’s view, dressed like a man. In December 2010, Greene came back to Harris as a janitor through a cleaning service, and Pierce terminated Greene as soon as he saw her there, again because Greene is a lesbian and dressed like a man. To justify his discriminatory actions, Pierce claimed that he terminated Greene’s contract in March because she charged too much. That was false. He claimed that Greene had inappropriately searched his desk. That was false. He claimed Greene screamed obscenities at him before she left in March. That was false. He also informed Eurest that Greene was not allowed to return to work at Harris because she had been previously banned from Harris’ premises. That was false as well. Yet somehow Greene'cannot get'past the pleading stage of this litigation.
The two questions presently before us are these: Did Greene allege facts in her complaint sufficient to state a claim that Harris was a joint employer of Greene when she was terminated in December 2010? And did Greene allege facts sufficient to state a claim that Pierce tortiously interfered with her employment relationship with Eurest in December 2010. In my view, both questions must be answered in the affirmative.
I.
The following facts are derived from Greene’s 34-page complaint, which is comprised of 255 separate allegations. For purposes of the Rule 12(b)(6) motion, all of the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of Greene. See Wright v. North Carolina, 787 F.3d 256, 263 (4th Cir. 2015).
Greene cleaned the Harris office in Maryland, without incident, for fourteen years. From March 1, 2008, through March 1, 2010, she did so under an automatically renewable contract with Hams. However, Harris was Greene’s only customer.
In October 2008, Pierce began working for Harris as the Director of Engineering. He treate4 Greene rudely from the outset, and in December 2009, “made overt discriminatory comments to other staff members about Ms. Greene’s personal appearance and manner of dress.” J.A. 75. “According to eyewitnesses, Mr. Pierce stated that Ms. Greene dressed like a man, ‘which really bothered him,’” and “described Ms. Greene as ‘frumpy, dumpy and dresses like a man in flannel and jeans.’ ” J.A. 75. “In late January to early' February 2010, a different set of Harris employees in a staff meeting [also] witnessed Mr. Pierce make derogatory re *167 marks concerning Ms. Greene’s personal appearance.” J.A. 76. One of the Harris employees “laughed and, in a manner demeaning to Ms. Greene, informed Mr. Pierce that, ‘Well, Dan, you know she’s a lesbian, don’t you?’” J.A. 76. “The staff members stated, that Mr. Pierce did not respond, but appeared visibly upset and then disgusted.” J.A, 77.
In early March, 2010, Pierce reviewed Greene’s contract, “elaim[ing] that the [New York] office had instructed him to do so.” J.A. 77. That was untrue. Greene was informed that her contract was being terminated for budgetary reasons. That was also untrue. Pierce terminated Greene’s contract because her sexual orientation and manner of dress were offensive to him. Pierce asked Greene to continue to clean until March 31, 2010, which gave him time to make alternate cleaning arrangements, and she agreed. However, “Pierce continued to disparage her” during this interim period and took steps to intentionally avoid her. J.A. 81. Pierce also falsely informed Harris’ human resources representative that Greene had “rifled through his desk” and “cursed him out” when he terminated her contract. J.A. 80 (internal quotation marks omitted).[1]
On April 1, 2010, Pierce chose Eurest to be the successor cleaning service for Harris. Among other things, the cleaning contract required Eurest to “immediately remove” any janitor whose services Harris “found to be unacceptable ... for cause, including, but not limited to, a reasonable belief that he or she is not qualified to perform or is not performing the Services as required.” J.A. 85 (emphasis added). Things did not go well. Several janitors were hired, but they often failed to show up and cleaned poorly when they did. This resulted in the “Harris employees continually complaining] about Eurest’s service.” J.A. 83.
In December 2010, Eurest hired Greene to clean the Harris office. “During the time Ms. Greene worked at Harris, she thoroughly cleaned the office,” and the “Harris employees commented about the onee-again spic-and-span office.” J.A. 86. However, “[w]hen Mr. Pierce saw Ms. Greene cleaning the office, he immediately had Harris security escort her from the premises.” J.A. 86. In other words, he fired her as soon as he saw her, because what he saw was a lesbian. To justify this action, Pierce resorted to his earlier lies about Greene. He first emailed Russell Moodie, the Senior Facilities Manager at Harris, demanding to know “what is going on,” J.A. 86, and repeating his claims that Greene was “the woman whom we dismissed because she was charging [too much],” and “the woman who [had] inappropriately searched [his] office and screamed obscenities at [him].” J.A, 86 (internal quotation marks omitted). Pierce also contacted Eurest “and lied, saying that Harris had prohibited Ms. Greene from the premises and Eurest had to immediately remove her from working at the office.” J.A. 87. Eurest, in turn, “presumed Ms. Greene had issues with Harris when she cleaned for them directly.” J.A. 88. Because the “contract gave Harris the right to dismiss any individual Eurest provided for cause,” “Eurest immediately ter *168 minated Ms. Greene’s employment.” J.A. 88. “Eurest explained that but for Mr. Pierce’s false information, Ms. Greene would still be employed at Harris.” J.A. 88.[2]
II.
“The joint employment doctrine captures instances in which multiple entities control an employee.” Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 409 (4th Cir. 2015). It recognizes that “two parties can be considered joint employers and therefore both be liable under Title VII if they share or co-determine those matters governing the essential terms and conditions of employment.” Id. at 408 (internal quotation marks omitted). “Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity.” Id. at 415.
We recently adopted the “joint employer doctrine” as the law in this circuit, and formulated a nine-factor test that “specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely.” Id. at 415. “[Njone of the[ ] factors are dispositive.” Id. at 414. However, the first three — “(1) authority to hire and fire the individual”; “(2) day-to-day supervision of the individual, including employee discipline”; and “(3) whether the putative employer furnishes the equipment used and the place of work” are the “most important.” Id.
A.
Under the Harris/Eurest contract, Eu-rest was responsible for payroll, benefits, insurance, and taxes associated with the janitors assigned to Harris’ worksite. Harris, however, retained more than a mere modicum of control over the hiring and firing of the individual janitors, as well as over their day-today activities. Among other things, the Harris/Eurest contract provided that:
(1) “Harris shall have the right to interview and otherwise evaluate all [Eu-rest] personnel assigned to perform services under this Agreement and to accept or reject any individual(s) based upon their experience.”
(2) “Harris shall have the right to require [Eurest] personnel to submit to Harris’ standard drug testing at Harris’ expense, or to require drug testing comparable to Harris’ standard to be performed by [Eurest] on all personnel if the personnel are to be onsite at any of Harris’ facilities.”
(3) “In the event that any [Eurest] personnel performing Services under th[e] Agreement are found to be unacceptable to Harris for cause, including, but not limited to, a reasonable belief that he or she is not qualified to perform or is not performing the Services as required, Harris shall notify [Eurest] of such fact in writing, setting forth such cause. [Eurest] shall immediately remove said employee from performing Services.... Harris is the sole judge as to performance capability but shall exercise its discretion reasonably.”
J.A. 84-85. Harris provided an on-site supervisor for the janitor. Harris was also to “meet with [the] on site supervisor and *169 review effectiveness [of the janitor] on a weekly basis for the first 3 months,” and, thereafter, “no more than on a biweekly basis but no less than monthly.” J.A. 85.
With regard to Greene in particular, she was assigned exclusively to Harris and was intended “to be on a long-term relationship with Harris.” J.A. 86. “Harris chose the days on which Ms. Greene worked at its office” and “Kellee Peebles, a Harris employee, was to be Ms. Greene’s on-site supervisor.” J.A. 85. “For security purposes, Harris required that a Harris employee escort Ms. Greene when she cleaned in a ‘Closed Area,’ he., an area performing classified work.” J.A. 86.
These allegations, viewed in the light most favorable to Greene, are sufficient to state a claim that Harris was a joint employer of Greene when she was terminated in December. Although Eurest was Greene’s direct employer, Harris reserved much of the first three and “most important” Butler factors to itself — authority to hire and fire, day-to-day supervision, and where and how the work was to take place. When Harris chose Eurest to replace Greene, it retained the right to interview individual janitors, the right to evaluate their experience and qualifications to perform cleaning services, the right to accept or reject the janitors based upon their experience, the right to submit the janitors to drug testing, and the right to terminate the janitors for cause. Harris also maintained control over the day-to-day supervision of the janitors, including Greene, and where and how the work would take place. Harris chose the days on which Greene was to work. Harris furnished the cleaning supplies and equipment for her use. Harris assigned an on-site supervisor to physically accompany her. And Harris was charged with conducting ongoing, periodic evaluations of her work.
Moreover, Pierce’s discriminatory animus and false accusations in March (which he resurrected to justify her immediate termination in December) are not irrelevant to the inquiry. Greene might well have been able to develop evidence and a persuasive argument that Pierce, when he “chose [Eurest to be the] successor cleaning service” for Harris, J.A. 82, maintained substantial control over the individual janitors just so he could “evad[e] liability [for his bigotry] by hiding behind another entity.” Butler, 793 F.3d at 410. According to the majority view, Harris and Pierce were at liberty to reject any janitor for any discriminatory reason — race, color, religion, sex or national origin — even though they were working exclusively at Harris’ office, under the day-to-day supervision of Harris employees, and using Harris supplies. That premise, I believe, is wholly inconsistent with the remedial principles that informed our decision in Butler.
B.
The majority concludes that dismissal under Rule 12(b)(6) is justified because the Harris/Eurest contract is a mere contract for janitorial services between a vendor and its client and does not fit the staffing agency-client relationship that we found to be a joint employment arrangement in Butler. Although discovery may have proven this to be true, I believe this at the very least to be a premature determination on our part.
First, Butler considered the joint employment doctrine for the first time and at the summary judgment stage. If anything, we recognized the fact-specific nature of the inquiry and cautioned against rigid application of its factors. See Butler, 793 F.3d at 413-14; id. at 414 (noting “that an employer-employee relationship is a ‘fact-intensive consideration of all aspects of the working relationship between the parties’ ” *170 (quoting Hunt v. State of Mo., Dep’t of Corr., 297 F.3d 735, 741 (8th Cir. 2002))); id. at 415 (noting that “no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration” (quoting Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 260 (4th Cir. 1997))). Also, while I might presume that a routine vendor-client contract for janitorial services would allow for the client to terminate services or refuse to pay if the cleaning is substandard, I cannot say at the Rule 12(b)(6). stage that the level of control that Harris retained over individual janitors is the norm.
Second, Butler did not purport to set the outer boundary for “joint employment” relationships. At a minimum, I believe that Greene’s allegations place the Harris/Eu-rest contract somewhere between the staffing agency-client relationship we considered in Butler and a simple contract for janitorial services between a vendor and a business client. And because Greene’s allegations “do not fall within the four corners of our prior case law,” dismissal under Rule 12(b)(6) is not justified. Wright, 787 F.3d at 263 (internal quotation marks omitted). “On the contrary, Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.” Id. (internal quotation marks omitted). “[A]s the law firms up in unsettled areas, it may be more feasible to dismiss weaker cases on the pleadings; otherwise, plaintiffs should be given an opportunity to develop evidence before the.merits are resolved.” Id. (internal quotation marks and alteration omitted).
C.
To conclude, I believe that Greene has set forth sufficient allegations to present a plausible claim that Harris was a joint employer “who exercise[d] actual control” over the individual janitors assigned exclusively to its premises, exercised that control against Greene.in a discriminatory manner, and should not be allowed to “avoid ... liability by hiding behind another entity.” Butler, 793 F.3d at 415. Somehow, Greene is faulted for not having worked longer in December and for not having established more evidence of supervision and control by Harris. But she was at work and she was terminated as soon as Pierce saw her. That is how discrimination manifests itself. You lose your job because of how you look, where you come from, or for some other immutable characteristic. Race, color, national origin, religion, sex, or, as in this case, sexual orientation and the way you dress mean everything; and job performance means nothing. That is what Greene alleges happened to her and I believe she should be allowed to go forward with her case. Accordingly, I would vacate the district court’s dismissal of Greene’s employment discrimination claim and remand for further proceedings.
III.
I also believe that Greene has alleged sufficient facts to state a claim for tortious interference with her economic relationship with Eurest.
A.
Maryland recognizes a tort action for “maliciously or wrongfully interfering with economic relationships.” Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 336 Md. 635, 650 A.2d 260, 268 (1994) (internal quotation marks omitted). To state a claim, the plaintiff must allege: “ ‘(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to- cause such damage and loss, without right or justifiable cause *171 on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.’ ” Painter’s Mill Grille, LLC v. Brown, 716 F.3d 342, 354 (4th Cir. 2013) (quoting Alexander, 650 A.2d at 269).
“[Wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiffs business relationships. Wrongful or unlawful acts include common law torts and ‘violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.’ ” Alexander, 650 A.2d at 271 (internal quotation marks omitted). “In addition, ‘actual malice,’ in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant’s malice is the primary factor that motivates the interference.” Id.
B.
In this case, Greene has alleged that Pierce immediately halted her in the performance of her janitorial duties under the Harris/Eurest contract and had Harris security escort her from the premises in December 2010 for the same malicious reason that he terminated her contract in March 2010 — “Greene’s sexual orientation (Lesbian) and appearance/manner of dress” were offensive to him. J.A. 100.
Pierce then set about proclaiming a litany of lies about Greene that were calculated to justify his action as one supported by legitimate employment reasons. Pierce falsely informed Moodie that Greene was the woman that he had dismissed in March 2010 for budgetary reasons and repeated his false claim that Greene had “inappropriately searched [his] office and screamed obscenities at [him]” before she left. J.A. 98 (internal quotation marks omitted). Pierce then “falsely informed [Eurest] that it had to immediately remove Ms. Greene from cleaning at Harris because Harris had previously barred her from the premises,” J.A, 70, leading Eurest to reasonably believe that “Greene had issues with Harris when she cleaned for them directly,” J.A. 100. And “[b]ecause the contract between Harris and Eurest gave Harris the right to remove a Eurest employee, Eurest had to terminate Ms. Greene.” J.A. 70.
By falsely representing to Eurest that Harris had “banned” or “barred” Greene when she worked directly for Harris in March, Pierce at a minimum implied that Greene had done something during her first stint that justified his accompanying demand that Eurest immediately remove her from the position in December. See Hearst Corp. v. Hughes, 297 Md. 112, 466 A.2d 486, 489 (1983) (A statement that “adversely affect[s] [an employee’s] fitness for the proper conduct of his business ... [is] actionable per se.”); see also Samuels v. Tschechtelin, 135 Md.App. 483, 763 A.2d 209, 242 (2000) (explaining that falsity of facts implied in allegedly defamatory statement can be basis for finding that statement was false); cf. id. at 245 (holding that statement that person was fired for poor performance on the job suggested that the judgment of those firing the person was founded on fact); Restatement (Second) of Torts § 566 (1977) (“A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.”).
This implication is even clearer in light of the fact that the context for Pierce’s statement was that he was exercising Harris’ contractual right to terminate Greene “for cause, including, but not limited to, a reasonable belief that ... she [was] not qualified to perform or [was] not performing the. [s]ervices as required.” J.A, 84. *172 Although Pierce may not have explicitly conveyed false reasons for why Greene was banned, to cover for his discriminatory ones, the clear implication in his statement was that she had done something to bring about the ban that would be cause for Harris’ rejection of her under Harris’ contract with Eurest.
Accordingly, I believe that Greene has stated a plausible'claim that Pierce, motivated by his discriminatory animus against lesbians, engaged in intentional and willful acts that were calculated to damage Greene’s work reputation and result in her termination, and which succeeded in causing actual damage and loss to Greene by (not surprisingly) causing Eurest to fire her.
C.
The majority is of the opinion that Greene’s claim must be dismissed under Rule 12(b)(6) because Greene acknowledged in her complaint that Harris had terminated her original contract in March and that Pierce had Harris security escort her from the premises upon seeing her in December. Building upon these acknowledgments, the majority appears to draw the factual inference that Pierce’s statement to Eurest must be true and, therefore, could not be defamatory. But to read the complaint in this fashion, one must read it in the light most favorable to Harris and Pierce, not to Greene.
Greene plainly alleged that Pierce “falsely informed [Eurest] that it had to immediately remove Ms. Greene from cleaning at Harris because Harris had previously barred her from the premises.” J.A. 70 (emphasis added). But Greene did not stop there. Greene also alleged that “after [Pierce] terminated her and her contract [in March], Mr. Pierce asked [her] to stay and clean another month until he obtained a successor cleaning service,” and “[n]either Mr. Pierce nor anyone else at the [Harris] office ever told Ms. Greene she was barred from the premises.” J.A. 99. Greene was informed in March that she was being replaced for budgetary reasons only and, of course, Greene returned to Harris to clean as a direct employee of Eurest in December. Clearly, these supporting allegations were intended to demonstrate the falsity of Pierce’s statement to Eurest in December that Greene had been banned from the Harris property when he terminated her in March.
Viewing these supporting factual allegations in the light most favorable to Greene, the only reasonable factual inference that can be drawn (were we at liberty to draw one) would be that Pierce did not ban Greene from the premises in March and that he only claimed to have done so to justify his hasty ejection of her from the .premises in December. But it is enough to say that Greene’s acknowledgement that Pierce terminated her contract in March and had security remove her from the premises in December simply does not contradict her allegation that Pierce lied to Eurest in December, nor does it provide a basis for dismissing her complaint on a Rule 12(b)(6)' motion to dismiss.[3]
Accordingly, I would vacate the district court’s dismissal of Greene’s tortious interference claim and also remand it for further proceedings.

. After Greene was terminated in December 2010, she initiated her claims for employment discrimination and interference with her employment relationship with Eurest before the Howard County Office of Human Rights ("OHR”). During the course of the administrative investigation, Harris and Pierce were forced to recant their claims that Greene had “rifled through [Pierce’s] desk” and “cursed him out” because several Harris employees who witnessed Greene's March termination were poised to directly contradict Pierce’s account.

. As noted by the majority, there is some discrepancy as to how long Greene had been on the job in December. The complaint indicates that she only worked a portion of her first day on the job. However, the OHR report and the parties seem to agree that Greene had been on the job for four days. I agree with the majority that the discrepancy is unimportant for purposes of this motion. Under either factual scenario, Greene had been hired and was on the job cleaning the Harris office when her employment was terminated.

. For the reasons set forth above, I also disagree with the majority's view that Pierce’s representation to Eurest that Greene had been "banned” or "barred” from Harris' premises after her earlier stint with them, even if false, was not defamatory. Such a statement, from one employer to another, could hardly have any connotation other than that Greene was not worthy of enjoying a good opinion or reputation as an employee.