**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1601**

KAREN E. GREENE,

Plaintiff - Appellant,

v.

HARRIS CORPORATION; HARL DAN PIERCE,

Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Marvin J. Garbis, Senior District
Judge.  (1:13-cv-00190-MJG)

Argued:  March 22, 2016                  Decided:  June 22, 2016

Before TRAXLER, Chief Judge, and WILKINSON and KEENAN, Circuit
Judges.

Affirmed by unpublished opinion.   Judge Keenan wrote the
majority opinion, in which Judge Wilkinson joined.  Chief Judge
Traxler wrote a dissenting opinion.

**ARGUED:** James R. Klimaski, KLIMASKI & ASSOCIATES, P.C.,
Washington, D.C., for Appellant.  Lynn E. Calkins, HOLLAND &
KNIGHT LLP, Washington, D.C., for Appellees.  **ON BRIEF:** John P.
Racin, Lynn I. Miller, KLIMASKI & ASSOCIATES, P.C., Washington,
D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

This case arose from plaintiff Karen Greene's employment as a janitor with Eurest Services, Inc. (Eurest). Eurest had assigned Greene to provide cleaning services at the office of the defendant, Harris Corporation (Harris), which Greene maintained also was her employer under a joint employment doctrine. Greene alleged that while working at Harris' office, Harris and its employee, Harl Dan Pierce, discriminated against her based on her sexual orientation and personal appearance, in violation of local anti-discrimination laws.

The district court dismissed Greene's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), concluding that Greene had failed to allege sufficiently that she was an "employee" of Harris as required by the relevant anti-discrimination laws. Upon our review, we affirm the district court's judgment.

I.

Before her employment with Eurest, Greene had provided janitorial services for Harris for 14 years under contracts between Harris and the cleaning company that Greene formerly operated.[1] In October 2008, during the period of Greene's

---

[1] Because the district court dismissed the complaint under Rule 12(b)(6), we accept the factual allegations in the complaint as true and construe them in the light most favorable (Continued)

2

contracts with Harris, Pierce began working in Harris' office in Columbia, Maryland (Harris' office). Pierce generally treated Greene in a rude manner. Pierce also made derogatory statements about Greene to other employees, including that she was "frumpy, dumpy, and dress[ed] like a man in flannel and jeans."

In January or February 2010, Pierce learned from another employee that Greene was a lesbian, and soon after terminated her contract. Greene first learned of the decision when she saw a termination letter while cleaning Pierce's office. Pierce later informed Greene that her contract was being terminated for budgetary reasons. Greene's last day at Harris under the terminated contract was March 31, 2010.

Later in the same year, Harris and Eurest entered into a contract for cleaning services under which Eurest agreed to assign some of its janitorial employees to clean Harris' office. Under the terms of the Eurest-Harris contract, Harris was required to provide cleaning supplies for Eurest's cleaning crew and to conduct on-site supervision of the crew's work. Harris also retained the ability to evaluate assigned Eurest personnel, and to exercise its discretion to refuse an assigned janitor "for cause."

---

to the plaintiff. Coleman v. Md. Court of Appeals, 626 F.3d 187, 189 (4th Cir. 2010).

3

Eurest hired Greene as a full-time Eurest employee on December 6, 2010, and assigned her to work at Harris' office. On her first day at Harris' office, Pierce saw Greene and "immediately had Harris security escort her from the premises."[2] Pierce sent an email the same day to Harris' facilities manager stating:

> I came to work this morning to find Karen Greene cleaning the facility. This is the woman whom we dismissed because she was charging us $5000 a month. This is the woman who inappropriately searched my office and screamed obscenities at me.
>
> Russ, what is going on?

Four days later, Pierce placed a telephone call to Eurest, stating that Harris had banned Greene from the premises and directing Eurest "to immediately remove her from working at the office." After receiving Pierce's complaint, Eurest terminated Greene's employment.

Greene filed this civil action[3] against Harris and Pierce (the defendants), alleging: (1) discrimination based on her

---

[2] In her complaint, Greene alleges that Pierce noticed her working at the office on December 6, 2010, and had her removed from the premises the same day. During the administrative investigation conducted by the Howard County Office of Human Rights, however, Greene stated that she worked at Harris for four days in December 2010. This discrepancy does not affect our analysis of the sufficiency of Greene's complaint.

[3] Greene originally filed her complaint in the Circuit Court for Howard County, Maryland. Harris removed the case to the United States District Court for the District of Maryland.

4

sexual orientation and personal appearance, in violation of Howard County, Maryland Code §§ 12.208, I(a) & II(a)(1);[4] and (2) a claim under Maryland law for tortious interference with her business relationship with Eurest. The district court granted the defendants' motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The court concluded that Greene was not an "employee" of Harris and, therefore, was not protected against Pierce's conduct under the Howard County anti-discrimination laws. The court also held that Greene had not plausibly alleged that Harris committed a "wrongful act," as required under Maryland law for a tortious interference claim. This appeal followed.

## II.

We review de novo the district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). Andon, LLC v. City of Newport News, Va., 813 F.3d 510, 513 (4th Cir. 2016). The allegations in a plaintiff's complaint "must state a claim to relief that is plausible on its face." Id. at 513-14 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))

_____

    [4] Maryland State Government Code § 20-1202(b) authorizes "a person that is subjected to a discriminatory act prohibited by the county code [to] bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief."

(internal quotation marks omitted). Accordingly, to survive a motion to dismiss, the "[f]actual allegations [of a complaint] must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A.

Greene first argues that she was an employee of both Eurest and Harris on December 6, 2010, and that the district court erred in concluding that she failed to allege an employment relationship with Harris. Although Greene's complaint relies heavily on selected language from the contract between Eurest and Harris, the record before us does not contain the entire contract. Nevertheless, Greene contends that because the contract gave Harris some authority to evaluate and supervise Eurest janitorial personnel, the contract thereby established an employment relationship between Greene and Harris. We disagree with Greene's argument.

As relevant here, the Howard County Code (the Code) prohibits employers from discharging an employee because of the person's sexual orientation or personal appearance. Howard County, Maryland Code (HCC) § 12.208, I(a), II(a). The Code defines the term "employer" as "a person, engaged in an industry or business, who has five or more full-time or part-time employees for each working day in each [of] 20 or more calendar weeks in the current or previous calendar year and any agent of

6

such a person." Id. § 12.208, (I)(d). The term "employee" is defined in a circular fashion as "an individual employed by an employer." Id. § 12.208, (I)(c). Because the definition of "employer" in the Code is analogous to the definition of that term in Title VII of the Civil Rights Act of 1964 (Title VII), see 42 U.S.C. § 2000e(b), we are guided by federal precedent in interpreting the Code's definition. See Taylor v. Giant of Md., LLC, 33 A.3d 445, 459 (Md. 2011) (explaining Maryland courts' "history of consulting federal precedent in the equal employment area") (citing Haas v. Lockheed Martin Corp., 914 A.2d 735, 742 (Md. 2007)).

After the district court's decision in this case, we issued our opinion in Butler v. Drive Automotive Industries of America, Inc., in which we held that a plaintiff pursuing a claim under Title VII may be considered an employee of more than one employer under the joint employment doctrine. 793 F.3d 404, 408 (4th Cir. 2015). We emphasized that this doctrine is intended to prevent "those who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing agency." Id. at 410.

We established a nine-factor test to determine whether an employee of a staffing agency also was employed by the client to which she was assigned, focusing on the amount of control the

7

client exercised over the putative employee.  Id. at 414.  Under this test, we may consider:

> (1) [the putative employer's] authority to hire and fire the individual;
>
> (2) [the] day-to-day supervision of the individual, including employee discipline;
>
> (3) whether the putative employer furnishes the equipment used and the place of work;
>
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
>
> (5) the length of time during which the individual has worked for the putative employer;
>
> (6) whether the putative employer provides the individual with formal or informal training;
>
> (7) whether the individual's duties are akin to a regular employee's duties;
>
> (8) whether the individual is assigned solely to the putative employer; and
>
> (9) whether the individual and putative employer intended to enter into an employment relationship.

Id.

The plaintiff in Butler was employed directly by a staffing agency, which conducted many traditional employer functions such as issuing paychecks and imposing employee discipline.  Id. at 415.  However, because the plaintiff in that case worked side-by-side with workers employed solely by the client, was directly engaged in producing the client's product, and was supervised by a manager employed by the client, we concluded that the

8

plaintiff had established an employment relationship necessary to subject the client to potential liability under Title VII. Id.

In contrast, Greene wholly has failed to plead plausible allegations of an employment relationship with Harris. Although Eurest assigned Greene exclusively to clean Harris' office, Greene's complaint alleges that she worked there only for a few hours in December 2010, undermining any contention that she developed an employment relationship with Harris over the course of an ongoing work assignment. The limited facts that Greene offers to support her allegation of an employment relationship are: (1) Harris provided the cleaning supplies for Eurest janitors, (2) Harris had the ability to interview prospective janitorial workers provided by Eurest, "evaluate" Eurest personnel, "accept or reject any individual(s) based upon their experience," and request that Eurest remove a person from the Harris assignment "for cause," (3) an on-site Harris employee supervised Eurest cleaning personnel, and (4) Harris selected the days on which Greene would work at its office.

These allegations are based largely on the contract between Eurest and Harris. Because the full contract was not made a part of the present record, we are unable to evaluate the full context of the parties' relative contractual responsibilities. Greene has not identified in her complaint how the cited

9

contractual provisions were applied in practice to her, other than the fact that a Harris employee was named as her on-site supervisor. Under the terms of the Eurest-Harris contract, Harris and its on-site supervisor regularly would "review effectiveness" of Eurest janitorial workers. And, notably, Greene does not allege that she actually met with or received any direction from any Harris supervisor during the few hours in December 2010 that she was present at Harris' facility. Construing the allegations most favorably to Greene, we conclude that the "effectiveness review" provision included in the contract does not amount to the "day-to-day supervision" controlling the manner in which work would be completed, which we found relevant in Butler. See Butler, 793 F.3d at 414-15.

Greene also has not alleged that her duties were related to Harris' business product, or that she performed work that also was undertaken by Harris employees. Nor has she plausibly alleged that Eurest or Harris intended that their contractual agreement establish any type of employment relationship between Eurest employees and Harris. See generally id. at 414.

Although Greene alleges that Harris possessed some control over which Eurest employees were assigned to Harris' contract, we conclude that these allegations alone do not establish an employment relationship between Greene and Harris. Our concern with the putative employer's authority to hire and fire in

10

Butler arose from the circumstances of the staffing agency-client relationship, namely, that the client could terminate staffing agency employees who were performing the work of the client, as it could its own direct employees. In contrast, here, Harris' authority to approve or reject Eurest employees arises from its authority to ensure that the services contract is performed to Harris' satisfaction.

The factors set forth in Butler are not intended for mechanical application, but instead provide a framework to elicit the true nature of a putative employment relationship. In the present case, considering all the facts alleged in Greene's complaint, we conclude that the contractual arrangement between Eurest and Harris is not analogous to the staffing agency-client relationship that supported our conclusion of a joint employment relationship in Butler. Instead, the contractual provisions cited by Greene describe a contract for janitorial services between a vendor of those services and its business client. We therefore hold that the district court did not err in concluding that Greene failed to state a claim of discrimination on which relief can be granted.

Apart from this conclusion, we observe that the conduct alleged in Greene's complaint is egregious in nature. However, allegations of animus or discriminatory behavior cannot create an employment relationship when such a relationship has not

11

otherwise been pleaded.  Although remedial in nature, see Butler, 793 F.3d at 409, anti-discrimination laws do not provide a remedy for all reprehensible conduct in society.  See, e.g., HCC § 12.208, I(d) (limiting the Code's remedial scheme to employers with five or more employees); cf. Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 257-58 (4th Cir. 1997) (concluding that an independent contractor was not entitled to protection under Title VII).  Thus, while future changes in the law may provide a remedy for such conduct as that alleged in Greene's complaint, this Court cannot create a remedy simply because it wants to achieve that result.

We also emphasize that because Greene did not challenge in her complaint Harris' earlier decision, in March 2010, to terminate her longstanding contract with Harris, we have not considered any indicia of employment that may have been present in that prior relationship.  Thus, we necessarily have decided only the case that Greene has set before us.

B.

Greene next argues that the district court erred in dismissing her claim under Maryland law for tortious interference with a business relationship.  She contends that Pierce tortiously interfered with her business relationship with

12

Eurest, by defaming her[5] in falsely stating to Eurest personnel that Harris previously had barred her from its premises. We disagree with Greene's argument.

To state a claim under Maryland law for tortious interference with a business relationship, a plaintiff must allege:

> (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 354 (4th Cir. 2013) (quoting Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260, 269 (Md. 1994)). In presenting a claim of this nature, the plaintiff must show that a defendant engaged in wrongful conduct, such as defamation or other common law tort. Alexander & Alexander, 650 A.2d at 271. A plaintiff asserting defamation bears the burden of proving that the challenged statement was "not substantially correct." Batson v. Shiflett, 602 A.2d 1191, 1210, 1212 (Md. 1992).

---

[5] Although Greene did not allege defamation explicitly in her complaint as a basis for her tortious interference claim, she did allege that Pierce made a false statement to Eurest, and argued a defamation theory before the district court and on appeal.

13

We conclude that Greene has not alleged facts raising a plausible inference that Pierce's statement, that Greene had previously been barred from Harris' office, was false. In her complaint, Greene acknowledges that her original contract was terminated effective March 31, 2010, and that Pierce "immediately had Harris security escort her from the premises" upon observing her at the office on December 6, 2010. Accordingly, Greene's own pleading refutes her assertion that Pierce's statement in December 2010, regarding Greene's exclusion from the premises, was not "substantially correct." Batson, 602 A.2d at 1212. Thus, because Greene's tortious interference claim rested on the purported falsity of that one statement, we conclude that the district court properly dismissed the claim under Rule 12(b)(6).[6]

## III.

For these reasons, we affirm the district court's judgment.

AFFIRMED

---

[6] Greene's tortious interference claim also fails on the separate ground that Pierce's alleged statement was not defamatory. To qualify as defamatory, a statement must "tend[] to expose a person to public scorn, hatred, contempt, or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." Batson, 602 A.2d at 1210. Pierce's statement that Greene was barred from Harris' office falls well short of this standard.

14

TRAXLER, Chief Judge, dissenting:

In March 2010, Dan Pierce terminated Karen Greene's fourteen-year stint as the janitor at Harris Corporation because Greene is a lesbian and, in Pierce's view, dressed like a man. In December 2010, Greene came back to Harris as a janitor through a cleaning service, and Pierce terminated Greene as soon as he saw her there, again because Greene is a lesbian and dressed like a man. To justify his discriminatory actions, Pierce claimed that he terminated Greene's contract in March because she charged too much. That was false. He claimed that Greene had inappropriately searched his desk. That was false. He claimed Greene screamed obscenities at him before she left in March. That was false. He also informed Eurest that Greene was not allowed to return to work at Harris because she had been previously banned from Harris' premises. That was false as well. Yet somehow Greene cannot get past the pleading stage of this litigation.

The two questions presently before us are these: Did Greene allege facts in her complaint sufficient to state a claim that Harris was a joint employer of Greene when she was terminated in December 2010? And did Greene allege facts sufficient to state a claim that Pierce tortiously interfered with her employment relationship with Eurest in December 2010. In my view, both questions must be answered in the affirmative.

15

The following facts are derived from Greene's 34-page complaint, which is comprised of 255 separate allegations. For purposes of the Rule 12(b)(6) motion, all of the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of Greene. See Wright v. North Carolina, 787 F.3d 256, 263 (4th Cir. 2015).

Greene cleaned the Harris office in Maryland, without incident, for fourteen years. From March 1, 2008, through March 1, 2010, she did so under an automatically renewable contract with Harris. However, Harris was Greene's only customer.

In October 2008, Pierce began working for Harris as the Director of Engineering. He treated Greene rudely from the outset, and in December 2009, "made overt discriminatory comments to other staff members about Ms. Greene's personal appearance and manner of dress." J.A. 75. "According to eyewitnesses, Mr. Pierce stated that Ms. Greene dressed like a man, 'which really bothered him,'" and "described Ms. Greene as 'frumpy, dumpy and dresses like a man in flannel and jeans.'" J.A. 75. "In late January to early February 2010, a different set of Harris employees in a staff meeting [also] witnessed Mr. Pierce make derogatory remarks concerning Ms. Greene's personal appearance." J.A. 76. One of the Harris employees "laughed and, in a manner demeaning to Ms. Greene, informed Mr. Pierce

16

that, 'Well, Dan, you know she's a lesbian, don't you?'" J.A. 76. "The staff members stated that Mr. Pierce did not respond, but appeared visibly upset and then disgusted." J.A. 77.

In early March, 2010, Pierce reviewed Greene's contract, "claim[ing] that the [New York] office had instructed him to do so." J.A. 77. That was untrue. Greene was informed that her contract was being terminated for budgetary reasons. That was also untrue. Pierce terminated Greene's contract because her sexual orientation and manner of dress were offensive to him. Pierce asked Greene to continue to clean until March 31, 2010, which gave him time to make alternate cleaning arrangements, and she agreed. However, "Pierce continued to disparage her" during this interim period and took steps to intentionally avoid her. J.A. 81. Pierce also falsely informed Harris' human resources representative that Greene had "rifled through his desk" and "cursed him out" when he terminated her contract. J.A. 80 (internal quotation marks omitted).[1]

---

[1] After Greene was terminated in December 2010, she initiated her claims for employment discrimination and interference with her employment relationship with Eurest before the Howard County Office of Human Rights ("OHR"). During the course of the administrative investigation, Harris and Pierce were forced to recant their claims that Greene had "rifled through [Pierce's] desk" and "cursed him out" because several Harris employees who witnessed Greene's March termination were poised to directly contradict Pierce's account.

On April 1, 2010, Pierce chose Eurest to be the successor cleaning service for Harris. Among other things, the cleaning contract required Eurest to "immediately remove" any janitor whose services Harris "found to be unacceptable . . . <u>for cause</u>, including, but not limited to, a reasonable belief that he or she is not qualified to perform or is not performing the Services as required." J.A. 85 (emphasis added). Things did not go well. Several janitors were hired, but they often failed to show up and cleaned poorly when they did. This resulted in the "Harris employees continually complain[ing] about Eurest's service." J.A. 83.

In December 2010, Eurest hired Greene to clean the Harris office. "During the time Ms. Greene worked at Harris, she thoroughly cleaned the office," and the "Harris employees commented about the once-again spic-and-span office." J.A. 86. However, "[w]hen Mr. Pierce saw Ms. Greene cleaning the office, he immediately had Harris security escort her from the premises." J.A. 86. In other words, he fired her as soon as he saw her, because what he saw was a lesbian. To justify this action, Pierce resorted to his earlier lies about Greene. He first emailed Russell Moodie, the Senior Facilities Manager at Harris, demanding to know "what is going on," J.A. 86, and repeating his claims that Greene was "the woman whom we dismissed because she was charging [too much]," and "the woman

18

who [had] inappropriately searched [his] office and screamed obscenities at [him]." J.A. 86 (internal quotation marks omitted). Pierce also contacted Eurest "and lied, saying that Harris had prohibited Ms. Greene from the premises and Eurest had to immediately remove her from working at the office." J.A. 87. Eurest, in turn, "presumed Ms. Greene had issues with Harris when she cleaned for them directly." J.A. 88. Because the "contract gave Harris the right to dismiss any individual Eurest provided for cause," "Eurest immediately terminated Ms. Greene's employment." J.A. 88. "Eurest explained that but for Mr. Pierce's false information, Ms. Greene would still be employed at Harris." J.A. 88.[2]

## II.

"The joint employment doctrine captures instances in which multiple entities control an employee." Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 409 (4th Cir. 2015). It recognizes that "two parties can be considered joint employers and therefore both be liable under Title VII if they share or

---

[2] As noted by the majority, there is some discrepancy as to how long Greene had been on the job in December. The complaint indicates that she only worked a portion of her first day on the job. However, the OHR report and the parties seem to agree that Greene had been on the job for four days. I agree with the majority that the discrepancy is unimportant for purposes of this motion. Under either factual scenario, Greene had been hired and was on the job cleaning the Harris office when her employment was terminated.

19

co-determine those matters governing the essential terms and conditions of employment." Id. at 408 (internal quotation marks omitted). "Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." Id. at 415.

We recently adopted the "joint employer doctrine" as the law in this circuit, and formulated a nine-factor test that "specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely." Id. at 415. "[N]one of the[] factors are dispositive." Id. at 414. However, the first three – "(1) authority to hire and fire the individual"; "(2) day-to-day supervision of the individual, including employee discipline"; and "(3) whether the putative employer furnishes the equipment used and the place of work" are the "most important." Id.

### A.

Under the Harris/Eurest contract, Eurest was responsible for payroll, benefits, insurance, and taxes associated with the janitors assigned to Harris' worksite. Harris, however, retained more than a mere modicum of control over the hiring and firing of the individual janitors, as well as over their day-to-day activities. Among other things, the Harris/Eurest contract provided that:

(1) "Harris shall have the right to interview and otherwise evaluate all [Eurest] personnel assigned to perform services under this Agreement and to accept or reject any individual(s) based upon their experience."

(2) "Harris shall have the right to require [Eurest] personnel to submit to Harris' standard drug testing at Harris' expense, or to require drug testing comparable to Harris' standard to be performed by [Eurest] on all personnel if the personnel are to be onsite at any of Harris' facilities."

(3) "In the event that any [Eurest] personnel performing Services under th[e] Agreement are found to be unacceptable to Harris for cause, including, but not limited to, a reasonable belief that he or she is not qualified to perform or is not performing the Services as required, Harris shall notify [Eurest] of such fact in writing, setting forth such cause. [Eurest] shall immediately remove said employee from performing Services. . . . Harris is the sole judge as to performance capability but shall exercise its discretion reasonably."

J.A. 84-85. Harris provided an on-site supervisor for the janitor. Harris was also to "meet with [the] on site supervisor and review effectiveness [of the janitor] on a weekly basis for the first 3 months," and, thereafter, "no more than on a bi-weekly basis but no less than monthly." J.A. 85.

With regard to Greene in particular, she was assigned exclusively to Harris and was intended "to be on a long-term relationship with Harris." J.A. 86. "Harris chose the days on which Ms. Greene worked at its office" and "Kellee Peebles, a Harris employee, was to be Ms. Greene's on-site supervisor." J.A. 85. "For security purposes, Harris required that a Harris

21

employee escort Ms. Greene when she cleaned in a 'Closed Area,' i.e., an area performing classified work." J.A. 86.

These allegations, viewed in the light most favorable to Greene, are sufficient to state a claim that Harris was a joint employer of Greene when she was terminated in December. Although Eurest was Greene's direct employer, Harris reserved much of the first three and "most important" Butler factors to itself -- authority to hire and fire, day-to-day supervision, and where and how the work was to take place. When Harris chose Eurest to replace Greene, it retained the right to interview individual janitors, the right to evaluate their experience and qualifications to perform cleaning services, the right to accept or reject the janitors based upon their experience, the right to submit the janitors to drug testing, and the right to terminate the janitors for cause. Harris also maintained control over the day-to-day supervision of the janitors, including Greene, and where and how the work would take place. Harris chose the days on which Greene was to work. Harris furnished the cleaning supplies and equipment for her use. Harris assigned an on-site supervisor to physically accompany her. And Harris was charged with conducting ongoing, periodic evaluations of her work.

Moreover, Pierce's discriminatory animus and false accusations in March (which he resurrected to justify her immediate termination in December) are not irrelevant to the

22

inquiry.  Greene might well have been able to develop evidence and a persuasive argument that Pierce, when he "chose [Eurest to be the] successor cleaning service" for Harris, J.A. 82, maintained substantial control over the individual janitors just so he could "evad[e] liability [for his bigotry] by hiding behind another entity."  Butler, 793 F.3d at 410.  According to the majority view, Harris and Pierce were at liberty to reject any janitor for any discriminatory reason – race, color, religion, sex or national origin – even though they were working exclusively at Harris' office, under the day-to-day supervision of Harris employees, and using Harris supplies.  That premise, I believe, is wholly inconsistent with the remedial principles that informed our decision in Butler.

B.

The majority concludes that dismissal under Rule 12(b)(6) is justified because the Harris/Eurest contract is a mere contract for janitorial services between a vendor and its client and does not fit the staffing agency-client relationship that we found to be a joint employment arrangement in Butler.  Although discovery may have proven this to be true, I believe this at the very least to be a premature determination on our part.

First, Butler considered the joint employment doctrine for the first time and at the summary judgment stage.  If anything, we recognized the fact-specific nature of the inquiry and

23

cautioned against rigid application of its factors. See Butler, 793 F.3d at 413-14; id. at 414 (noting "that an employer-employee relationship is a 'fact-intensive consideration of all aspects of the working relationship between the parties'" (quoting Hunt v. State of Mo., Dep't of Corr., 297 F.3d 735, 741 (8th Cir. 2002)); id. at 415 (noting that "no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration" (quoting Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 260 (4th Cir. 1997)). Also, while I might presume that a routine vendor-client contract for janitorial services would allow for the client to terminate services or refuse to pay if the cleaning is substandard, I cannot say at the Rule 12(b)(6) stage that the level of control that Harris retained over individual janitors is the norm.

Second, Butler did not purport to set the outer boundary for "joint employment" relationships. At a minimum, I believe that Greene's allegations place the Harris/Eurest contract somewhere between the staffing agency-client relationship we considered in Butler and a simple contract for janitorial services between a vendor and a business client. And because Greene's allegations "do not fall within the four corners of our prior case law," dismissal under Rule 12(b)(6) is not justified. Wright, 787 F.3d at 263 (internal quotation marks omitted). "On

24

the contrary, Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." Id. (internal quotation marks omitted)). "[A]s the law firms up in unsettled areas, it may be more feasible to dismiss weaker cases on the pleadings; otherwise, plaintiffs should be given an opportunity to develop evidence before the merits are resolved." Id. (internal quotation marks and alteration omitted).

## C.

To conclude, I believe that Greene has set forth sufficient allegations to present a plausible claim that Harris was a joint employer "who exercise[d] actual control" over the individual janitors assigned exclusively to its premises, exercised that control against Greene in a discriminatory manner, and should not be allowed to "avoid . . . liability by hiding behind another entity." Butler, 793 F.3d at 415. Somehow, Greene is faulted for not having worked longer in December and for not having established more evidence of supervision and control by Harris. But she was at work and she was terminated as soon as Pierce saw her. That is how discrimination manifests itself. You lose your job because of how you look, where you come from, or for some other immutable characteristic. Race, color, national origin, religion, sex, or, as in this case, sexual orientation and the way you dress mean everything; and job

25

performance means nothing.  That is what Greene alleges happened to her and I believe she should be allowed to go forward with her case.  Accordingly, I would vacate the district court's dismissal of Greene's employment discrimination claim and remand for further proceedings.

## III.

I also believe that Greene has alleged sufficient facts to state a claim for tortious interference with her economic relationship with Eurest.

## A.

Maryland recognizes a tort action for "maliciously or wrongfully interfering with economic relationships."  Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260, 268 (Md. 1994) (internal quotation marks omitted).  To state a claim, the plaintiff must allege:  "'(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'"  Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 354 (4th Cir. 2013) (quoting Alexander, 650 A.2d at 269).

"[W]rongful or malicious interference with economic relations is interference by conduct that is independently

26

wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" Alexander, 650 A.2d at 271 (internal quotation marks omitted). "In addition, "'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference." Id.

B.

In this case, Greene has alleged that Pierce immediately halted her in the performance of her janitorial duties under the Harris/Eurest contract and had Harris security escort her from the premises in December 2010 for the same malicious reason that he terminated her contract in March 2010 – "Greene's sexual orientation (Lesbian) and appearance/manner of dress" were offensive to him. J.A. 100.

Pierce then set about proclaiming a litany of lies about Greene that were calculated to justify his action as one supported by legitimate employment reasons. Pierce falsely informed Moodie that Greene was the woman that he had dismissed in March 2010 for budgetary reasons and repeated his false claim

27

that Greene had "inappropriately searched [his] office and screamed obscenities at [him]" before she left. J.A. 98 (internal quotation marks omitted). Pierce then "falsely informed [Eurest] that it had to immediately remove Ms. Greene from cleaning at Harris because Harris had previously barred her from the premises," J.A. 70, leading Eurest to reasonably believe that "Greene had issues with Harris when she cleaned for them directly," J.A. 100. And "[b]ecause the contract between Harris and Eurest gave Harris the right to remove a Eurest employee, Eurest had to terminate Ms. Greene." J.A. 70.

By falsely representing to Eurest that Harris had "banned" or "barred" Greene when she worked directly for Harris in March, Pierce at a minimum implied that Greene had done something during her first stint that justified his accompanying demand that Eurest immediately remove her from the position in December. See Hearst Corp. v. Hughes, 466 A.2d 486, 489 (Md. 1983) (A statement that "adversely affect[s] [an employee's] fitness for the proper conduct of his business . . . [is] actionable per se."); see also Samuels v. Tschechtelin, 763 A.2d 209, 242 (Md. Ct. Spec. App. 2000) (explaining that falsity of facts implied in allegedly defamatory statement can be basis for finding that statement was false); cf. id. at 245 (holding that statement that person was fired for poor performance on the job suggested that the judgment of those firing the person was

28

founded on fact); Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").

This implication is even clearer in light of the fact that the context for Pierce's statement was that he was exercising Harris' contractual right to terminate Greene "for cause, including, but not limited to, a reasonable belief that . . . she [was] not qualified to perform or [was] not performing the [s]ervices as required." J.A. 84. Although Pierce may not have explicitly conveyed false reasons for why Greene was banned, to cover for his discriminatory ones, the clear implication in his statement was that she had done something to bring about the ban that would be cause for Harris' rejection of her under Harris' contract with Eurest.

Accordingly, I believe that Greene has stated a plausible claim that Pierce, motivated by his discriminatory animus against lesbians, engaged in intentional and willful acts that were calculated to damage Greene's work reputation and result in her termination, and which succeeded in causing actual damage and loss to Greene by (not surprisingly) causing Eurest to fire her.

29

C.

The majority is of the opinion that Greene's claim must be dismissed under Rule 12(b)(6) because Greene acknowledged in her complaint that Harris had terminated her original contract in March and that Pierce had Harris security escort her from the premises upon seeing her in December. Building upon these acknowledgments, the majority appears to draw the factual inference that Pierce's statement to Eurest must be true and, therefore, could not be defamatory. But to read the complaint in this fashion, one must read it in the light most favorable to Harris and Pierce, not to Greene.

Greene plainly alleged that Pierce "falsely informed [Eurest] that it had to immediately remove Ms. Greene from cleaning at Harris because Harris had previously barred her from the premises." J.A. 70 (emphasis added). But Greene did not stop there. Greene also alleged that "after [Pierce] terminated her and her contract [in March], Mr. Pierce asked [her] to stay and clean another month until he obtained a successor cleaning service," and "[n]either Mr. Pierce nor anyone else at the [Harris] office ever told Ms. Greene she was barred from the premises." J.A. 99. Greene was informed in March that she was being replaced for budgetary reasons only and, of course, Greene returned to Harris to clean as a direct employee of Eurest in December. Clearly, these supporting allegations were intended

30

to demonstrate the <u>falsity</u> of Pierce's statement to Eurest in December that Greene had been banned from the Harris property when he terminated her in March.

Viewing these supporting factual allegations in the light most favorable to Greene, the only reasonable factual inference that can be drawn (were we at liberty to draw one) would be that Pierce did <u>not</u> ban Greene from the premises in March and that he only claimed to have done so to justify his hasty ejection of her from the premises in December. But it is enough to say that Greene's acknowledgement that Pierce terminated her contract in March and had security remove her from the premises in December simply does not contradict her allegation that Pierce lied to Eurest in December, nor does it provide a basis for dismissing her complaint on a Rule 12(b)(6) motion to dismiss.[3]

Accordingly, I would vacate the district court's dismissal of Greene's tortious interference claim and also remand it for further proceedings.

---

[3] For the reasons set forth above, I also disagree with the majority's view that Pierce's representation to Eurest that Greene had been "banned" or "barred" from Harris' premises after her earlier stint with them, even if false, was not defamatory. Such a statement, from one employer to another, could hardly have any connotation other than that Greene was not worthy of enjoying a good opinion or reputation as an employee.